SOCIETE COMPTOIR DE L'INDUSTRIE COTONNIERE, ETABLISSEMENTS BOUSSAC, Christian Dior, Societe a Responsabilite Limitee, Paris, and Christian Dior New York, Incorporated, Plaintiffs,

v.

ALEXANDER'S DEPARTMENT STORES, INC., Defendant.

United States District Court
S. D. New York.
Jan. 20, 1961.

David Rayvid, New York City, for plaintiffs, Morton Amster, Amster & Levy, New York City, of counsel.

Lewis, Durante & Bartel, New York City, for defendant, J. Norman Lewis, James P. Durante, Frederick E. Smithline, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for The Chambre Syndicale de la Couture Parisienne, amicus curiae, Sylvan Gotshal, Ira M. Millstein, Marshall C. Berger, New York City, of counsel.

DIMOCK, District Judge.

Before me are a motion by plaintiffs above named, who will be referred to collectively for convenience as "Dior", for a preliminary injunction, and a motion by defendant Alexander's Department Stores, Inc., which will be referred to for convenience as Alexander's, for an order under Rule 12(b) (6) F.R.Civ.P., dismissing the complaint on the ground that it fails to state a claim on which relief can be granted. Affidavits in support of the motion to dismiss and in opposition to it have been submitted so that, pursuant to Rule 12(b), I shall treat the motion as one for summary judgment and dispose of it as provided in Rule 56.

The action is one brought by a group of corporations who do business under the name "Dior" or "Christian Dior" and who have registered those names as trade-marks. It is based upon the use of the name Dior by defendant in connection with the sale of women's dresses. No answer has as yet been interposed. Defendant's affidavits in support of the motion for summary judgment raise, however, several affirmative defenses.

Plaintiff can support its position in opposition to the motion for summary judgment by relying upon charges in the complaint which are here undenied by affidavit or as to which there is an issue of fact presented by the affidavits. On the other hand, nothing can be considered in support of plaintiff's motion for a preliminary injunction except facts supported by affidavit. I shall first state the facts alleged in the affidavits and then, as part of my consideration of the merits of the motion for summary judgment, state the allegations of the complaint.

Allegations in Plaintiff's Affidavits.

Christian Dior, Paris, a French corporation, one of the group collectively referred to as plaintiff, was established in 1947 and since that time has achieved

world-wide fame as a leading couturier. The fashions which Christian Dior, Paris, designs, manufactures and sells are of the highest quality available from any fashion house in the world with regard to original design, quality, styling, details of manufacture, fit and general superiority in all aspects of ladies' clothing. The name Dior has achieved world-wide fame in the fashion field as the result of the activities of Christian Dior, Paris, and Christian Dior, New York, Incorporated, another of the corporations referred to collectively as plaintiff. Societe Comptoir de l'Industrie Cotonniere, Etablissements Boussac, a French corporation, is the third corporation of the group of three collectively referred to as plaintiff. It owns and controls both Christian Dior, Paris, and Christian Dior, New York, Incorporated, and is the owner of the trade-mark registrations. The French subsidiary is authorized to utilize these trade-marks on ladies' fashions within the Republic of France and throughout the world. The New York corporation is similarly licensed to utilize the trade-marks within the United States.

An item on the fashion page of the New York Times for March 7, 1960 resulted from a news release sent out by defendant. It consisted of a picture of a dress with a description and the legend "By Dior $35. All copies, second floor, Alexander's."

On September 11, 18 and 25, 1960, defendant Alexander's, which operates a group of department stores in the New York area, placed advertisements in a number of New York newspapers containing statements to the general effect that Alexander's had brought back from the continent one of the nation's largest collections of couturier originals, that Alexander's panel of experts had had them reproduced by America's leading manufacturers and that it was almost impossible to tell the copies from the originals. These advertisements listed the names of eighteen European couturiers, including Dior.

On September 13, 1960, defendant Alexander's sponsored and produced a television fashion show during the course of which an original Dior garment was exhibited to the television public and reference was made to the name Dior.

These uses of the name Dior were without authorization by plaintiff.

It is alleged that similar conduct of defendant has continued and still continues.

Plaintiff's affidavit concedes that original designs by Christian Dior, Paris, are not subject to protection in the United States. The affidavit states, however, that plaintiff protects its valuable trade-mark and reputation by allowing its customers to reproduce the designs of purchased garments but reserving the use of the name Dior to retail stores of the highest quality, association with which will not have a deleterious effect on the value of the trade-mark. In accordance with this general rule there are three situations which are encountered with respect to United States retailers.

First, Dior sells ladies' wearing apparel to a selected group of retail establishments in the United States for purposes of relatively high-priced reproduction by such retail establishments. These purchasers are given permission to utilize the name Dior in advertising the authorized reproductions. The name, however, is never allowed to be used on the reproductions themselves. Extreme care is exercised to insure that each of such retail establishments is of the highest reputation so that plaintiff is assured that the name Dior will be used only in connection with garments of the highest quality and only in stores where customer service is excellent and customer satisfaction is rigidly protected.

Second, a few stores are permitted to purchase Dior dresses with the understanding that they will be used as models for popular priced reproductions but that the name Dior will never be used in connection with the sale of such reproductions.

Third, there is a group of retail establishments in the United States which plaintiff has traditionally refused to authorize to copy Dior designs.

In addition to its sales to retailers in the United States, Dior also sells to United States manufacturers who desire to reproduce Dior designs independently. The contract of sale in such cases provides that, unless the manufacturer has received a specific written authorization, the use of the name Dior in whole or in part in advertising, labels or elsewhere, is prohibited.

Defendant Alexander's has several times been refused the right to purchase and reproduce Dior garments. These refusals were based upon plaintiff's investigation of the merchandising techniques employed by defendant. This decision was largely based upon a report of an investigator a copy of which is submitted with the affidavits of plaintiff but without the oath of the investigator.

During the winter of 1959–1960 a large cosmetic firm sponsored and produced a television "spectacular" on which were displayed the latest designs of several world famous couturiers including those of Dior. The group received in payment from the sponsor a substantial sum of money for the right to exploit the trademarks, trade names, good will and reputation of the couturiers.

Plaintiff has at the present time granted an option to a television production company for the use of the name Christian Dior and Dior and for the display of Christian Dior designs on television.

A shopper employed by plaintiff called at defendant's Bronx store on November 1, 1960 and asked to see dresses in a price range of not more than $50 nor less than $30 and asked whether defendant had any dresses by famous European designers, specifically referring to Dior. The saleswoman took three dresses off racks labeled "Manufacturers Closeout". The shopper took one in her hand and asked "Who is the designer of this?" The saleswoman replied, "This is the House of Dior" and stated that all three had appeared on their September television show and in subsequent newspaper advertisements. She said that one was a copy of a Dior dress which defendant sold for $95 following the fashion show in September. The shopper purchased one of the dresses and, saying that it would need alteration, asked that the saleswoman call a seamstress. She was told that defendant did not have a seamstress. The shopper pointed to a soiled spot on the skirt and a pulled thread. The saleswoman said "Oh, well, you can always have it cleaned and pressed" and further remarked that the flaw in the skirt would "press right out". The saleswoman said that the television show had been televised directly from the airport where a number of dresses sold by defendant were modeled, including the Dior dress which the shopper had just purchased and which defendant sold for $95 following the fashion show. Plaintiff in its affidavits characterized this dress as a cheap imitation of a Dior model.

Another shopper employed by plaintiff went to defendant's Bronx store on September 26, 1960. She followed a sign directing towards "French and Italian fashions" and entered a merchandise area entitled "La Boutique" where there were a number of individual racks on which clothing was hung. The individual racks were labeled "Adaptation of * * *" followed by the name of the particular French or Italian couturier. Along one wall in this room there were a large number of dresses hung on a single rack which were individually labeled "Originals by * * * (followed by a famous couturier's name) Alexander's Exclusive Paris (or in some cases Italy) Adaptation." In response to a request for a Dior garment, a dress of identical style with the one purchased by the other shopper was displayed. When the request was made the saleswoman directed a second girl to "find the Dior adaptation".

During frequent visits by the managing director of Christian Dior, Paris, to the United States he makes checks of the retail establishments which are authorized to sell Christian Dior reproductions and to make reference to the Dior name. He observes the quality of the reproductions sold by the retail stores and fur-

ther assures himself that the particular retail store measures up to the high standards of customer service set by Christian Dior, Paris.

While plaintiff authorizes Ohrbach's to make reproductions from originals designed by plaintiff, Ohrbach's is not authorized to use the name Dior and does not do so.

Allegations in Defendant's Affidavits.

Defendant is a department store with four branches, specializing in the retail sale of wearing apparel for men, women and children. It employs approximately 5,000 employees and its total sales for the last fiscal period were approximately $100,000,000. It is a popular department store, catering to all groups. It has a reputation for retailing quality products at low prices. It has eliminated credit and delivery and has thus effected considerable savings from the operation cost. These savings are passed on to defendant's customers by reducing selling prices for fashion goods and those prices are lower than those usually prevailing in competitive stores.

The individual Christian Dior enjoyed a favorable reputation as one of the world's foremost designers until his death on October 24, 1957, but since his death there has been a rapid descent in the exalted position of the name Dior. The conclusory statement is made that plaintiff seeks to palm off its designs as creations of Christian Dior who died over three years ago.

Plaintiff, in selling original designs to defendant and other American manufacturers, is discriminating in price against defendant and other American buyers by compelling them to pay twice as much as other purchasers do for the same designs, whether they are retailers or manufacturers. The prices of plaintiff's garments embodying the original designs are from $750 to $7,500 and there are two showings each year of approximately 100 numbers.

Plaintiff attempts to force the reproduced garments to be sold under the name "Monsieur X" if the garments are retailed for less than $100. Stores such as Macy's and Ohrbach's who buy Dior originals in Paris and copy them here are not permitted to use the name for copies that are sold for less than $100. They must refer to the designer as "Monsieur X". If the identical garment is retailed for $100 or more in another store or even in the same store, then the garment may be advertised as a copy of Dior or of Christian Dior. The penalty for violation is elimination of the customer. The same penalty is imposed if a customer of Dior fails to force upon its subcustomers the same rule.

Plaintiff and certain department stores in New York entered into an agreement whereby, to suppress and eliminate defendant's competition in copies of plaintiff's products, these department stores would increase considerably their purchases of plaintiff's garments, provided that plaintiff would refuse to sell its products to defendant. This combination and conspiracy to eliminate the competition of defendant in the copies of plaintiff's product was created in 1952, and it has continuously been in operation ever since.

More than a year prior to the institution of this claim defendant advertised in the public press that it was retailing in its stores a copy of a Dior garment. On November 2, 1959, the attorney for plaintiff advised defendant in writing that plaintiff objected to defendant's advertising. Plaintiff did nothing further until the filing of the suit more than a year later.

Defendant is a retailer, not a manufacturer. Many among the manufacturers sell their copies of plaintiff's garments not only to defendant but to literally hundreds of other retailers throughout the United States. The garments referred to by plaintiff in every respect are identical with those sold in the prominent Fifth Avenue stores, including Saks Fifth Avenue and dozens of other leading department stores throughout the United States.

Merchandising conditions under which defendant sells plaintiff's copied models

are identical with those at Ohrbach's, which is one of plaintiff's largest customers in New York. Plaintiff has conceded publicly in the New York Times of September 16, 1960, that retail price is the determining factor as to whether or not the name Dior is authorized by plaintiff. If the garment retails for $100 or more the retailer may use the words "Copy of Christian Dior" but, if the retail price is under $100, then the retailer must use the name "Monsieur X".

Plaintiff does not exercise any supervision over the manufacturing process of the manufacturers to whom plaintiff sells.

Plaintiff does not enforce against its customers the rule that dresses sold for less than $100 may not be referred to as Dior. As an example of this, an instance is cited where, on December 8, 1960, two dresses were observed at Saks Fifth Avenue, identical in every respect, one carrying a hang ticket reading "Copy of Monsieur X" and the other carrying a hang ticket reading "Copy of Christian Dior". The price of each dress was $73. The dresses were identical with one sold by defendant at the same time at the price of $20.

Every garment retailed by defendant as a copy, adaptation or reproduction of plaintiff's original design was in truth and in fact precisely that.

### Defendant's Motion For Summary Judgment.

Before taking up the affirmative defenses which defendant asserts in its affidavit in support of its motion for summary judgment, I must consider whether the complaint, aside from any such affirmative defense, can, in spite of the facts alleged in affidavit form by defendant and as supported by the facts alleged in affidavit form by plaintiff, state a claim upon which relief can be granted.

The complaint contains four counts. Count one is evidently asserted under section 32(1) of the Lanham Act, July 5, 1946, c. 540, title VI, 60 Stat. 437, 15 U.S.C. § 1114(1), which provides that any person who shall in commerce use any reproduction of a registered mark in connection with the sale, offer for sale, or advertising of any goods or services "on or in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services" shall be liable to a civil action by the registrant for all the remedies thereinafter provided. It is alleged that the use by defendant of the trade-marks Dior and Christian Dior is likely to cause confusion or mistake and to deceive purchasers as to the source or origin of the garments sold by defendant.

The second count is a claim alleged to be pendent on the first count for violation of the trade-mark laws. It alleges that the acts of defendant constitute unfair competition and have resulted in unjust enrichment to defendant and further that such acts will interfere, and have interfered, with the contractual relationships existing between plaintiffs among themselves and between them and the retail establishments and selected retail department stores to which models have been sold, and will diminish the value of property rights granted to plaintiff Christian Dior, New York, Incorporated.

The third count is based upon use by defendant of the name Dior over television and alleges that such use constituted an unlawful appropriation of plaintiff's property rights and substantially damaged plaintiff by reducing the value of or destroying such property rights.

The fourth count again goes back to the Trade-Mark Law of 1946 for its basis and alleges that defendant's use of plaintiff's trade-mark violates section 43(a) of the Lanham Act, July 5, 1946, c. 540, title VIII, 60 Stat. 441, 15 U.S.C. § 1125 (a), in that it constitutes a "false description or representation, including words or other symbols tending falsely to describe or represent" goods sold.

Putting aside the matter of affirmative defenses, defendant cannot succeed on its motion for summary judgment unless the facts alleged in defend-

ant's affidavits as to which there is no substantial issue of fact raised by plaintiff's affidavits demonstrate that plaintiff cannot succeed in establishing the particular count under consideration. Manifestly the facts alleged in defendant's affidavits make no such demonstration; at a trial new facts, even if the facts alleged by plaintiff in its affidavits would not do so, may establish each one of the four counts. Plaintiff is not limited in its proof to the allegations of the complaint. See Rosen v. Texas Company, D. C.S.D.N.Y., 161 F.Supp. 55.

Defendant's serious contention, however, is that the facts stated in its affidavits as to which there is no substantial issue constitute affirmative defenses to plaintiff's four counts.

Defendant's affirmative defenses relied upon before me are the following: First, that plaintiff's efforts to control its products after sale constitute a violation of the anti-trust laws of the United States; second, that a dismissal of the complaint and a denial of any protection to plaintiff is required on account of the misuse of plaintiff's trade-marks and the fraud committed by it in that Christian Dior is no longer alive and in that the public is defrauded by the arbitrary establishment of the price of $100 or more at which a copy or adaptation of a Dior model must be sold if the name Dior is used and the use of another name, "Monsieur X", for the same garment when sold below $100; third, that plaintiff has threatened litigation of an unlawful character against defendant and the manufacturers from whom it purchases garments and that consequently dismissal of the complaint is required; fourth, that plaintiff has lost the right to rely upon its trade-mark by allowing its use by purchasers which are unrelated companies.

Defendant's first affirmative defense is stated by defendant's counsel to be that plaintiff's efforts to control its product after sale constitute a violation of the anti-trust laws of the United States. The conclusory allegations of a conspiracy to exclude plaintiff from business were not pressed as supporting this defense.

Neither the complaint nor any of defendant's affidavits nor any of plaintiff's affidavits disclose any effort to control products after sale. The worst that defendant charges is that plaintiff refuses to sell to retailers unless they agree that they will not use the name Dior in connection with the sale of copies manufactured pursuant to the retailer's directions where the garment is priced below $100 and that plaintiff refuses to sell to manufacturers unless such manufacturers agree to exact from retailers to whom they sell copies a similar agreement with respect to elimination of the name Dior in connection with sales of any garments priced at less than $100. The retailer or the manufacturer can do whatever it likes with the garment sold by Dior. The only restriction is in connection with other goods, copies of the garments sold by Dior. Even were we to accept the analogy of a refusal to sell as part of a device for fixing the retail price of the article offered for sale to others, the transaction would not come within the condemnation of the anti-trust laws. The refusal here to sell unless the required promise is given is a legitimate, though perhaps practically unenforceable, device for creating in the mind of the purchasing public an association between Dior copies and good material, workmanship and service. If retailers are required to charge $100 in order to state that what they are selling is a Dior copy they will tend to give the quality of material, workmanship and service for which the public is willing to pay $100. The plan does not come within the interdiction of the recent United States v. Parke Davis & Co., 362 U.S. 29, 80 U.S. 503, 4 L.Ed.2d 505, against refusal to sell as a means of constructing a combination or conspiracy to fix resale prices.

Defendant's second affirmative defense is that plaintiff is barred by fraud perpetrated on the public.

The claim that the use of the name of the dead designer Christian Dior is a

fraud on the public hardly deserves discussion. It would take the strongest kind of evidence to convince the court that the public was being led to believe that a man named Dior was designing the dresses. Yet defendant has not produced a shred of evidence that anyone has ever been deluded into such a misbelief.

Defendant's claim that the public is being defrauded because sales of the identical garment are being made at $100 where represented to be a copy of Dior and at less than that where not so represented could be significant only if it were charged that plaintiff was a party to any such plan. All that plaintiff intends is to have all dresses represented to be copies of its models priced in the $100 class. No proof has been submitted sufficient to indicate that plaintiff's plan was either intended to or inevitably did result in any widespread selling of the identical dress for one price when represented to be a copy of a Dior model and for a lower price when not so represented. Even were that the case, it is extremely doubtful whether it would constitute such a fraud on the public as to debar plaintiff from the courts.

Defendant's third affirmative defense is that plaintiff's threats of litigation against defendant and manufacturers from whom defendant purchases garments debar plaintiff from court.

Defendant cites Judge Conger's statement in Thierfeld v. Postman's Fifth Avenue Corporation, D.C.S.D.N.Y., 37 F. Supp. 958, 962, "Threatening defendants' customers with infringement suits, when done in bad faith would sustain the granting of an injunction." All that defendant cites here is an advertisement which plaintiff placed in the publication "Women's Wear Daily", of January 9, 1959. This advertisement stated in substance that no manufacturers had been authorized to use the name Dior in advertising and that the use of the name for advertising or publicity had been reserved for those retailers who bought directly from plaintiff. Not a word was said about litigation. Defendant produc-

es no facts to indicate that the advertisement was published with anything but the most complete belief that the reservation to retailers purchasing from plaintiff of the right to use the name Dior was perfectly effective. The asserted affirmative defense is without substance.

For a fourth and final affirmative defense defendant says that plaintiff has lost the right to exclusive use of its name as a trade-mark by permitting purchasers from plaintiff and plaintiff's authorized manufacturers to state that copies of plaintiff's models were such copies.

Plaintiff has done no more than to permit retailers to tell the absolute truth about garments sold by the retailers, to wit, that they were copies of Dior models. Where the right to a trade-mark is lost by granting permission for its use by others, the reason for the loss is that the owner has permitted the mark to become identified with the business of others and, at the same time, has led the public to believe that the business of the licensee was actually being conducted by the trade-mark owner. Everett O. Fisk & Co., Inc. v. Fisk Teachers' Agency, Inc., 8 Cir., 3 F.2d 7. Here the name Dior continues to be associated with the Dior original. Plaintiff's right to the name Dior as its trade-mark for the original garment remains unaffected.

Defendant's affidavits thus fail to establish that defendant is entitled to summary judgment either on the ground that plaintiff's affirmative case is without substance or on the ground that one or more of defendant's affirmative defenses constitutes a bar.

### The Motion for a Preliminary Injunction.

As support for a preliminary injunction the court can consider only facts presented by affidavit or testimony and cannot consider facts provable under the modern liberal interpretation of the complaint but which have not been proved. Indeed, proof to support a preliminary injunction must be strong and clear in view of the restraint put upon the defendant at a time before his liability has actual-

ly been adjudged. If we insist, as we must, on proof of that character, all that we have here is that defendant has been selling copies of Dior models and saying either by word of mouth or newspaper or television advertising that they were copies of Dior models. Plaintiff asserts that it is entitled to have that stopped.

■ We start with the proposition that defendant has an indubitable right to copy plaintiff's models and sell the copies. See Fashion Originators Guild of America v. Federal Trade Comm., 2 Cir., 114 F.2d 80, affirmed 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949. Plaintiff does not dispute this but asserts that defendant in copying its models may not say that they are copies of Dior models.

Plaintiff says that defendant's statement that the copies of plaintiff's models that defendant sells are copies of Dior models constitutes unfair competition. In support of this claim plaintiff cites Metropolitan Opera Association v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483, affirmed 279 App. Div. 632, 107 N.Y.S.2d 795. There the Metropolitan Opera Association was granted an injunction against one who intercepted a broadcast of an opera from the Metropolitan Opera House in New York and sold records incorporating the broadcast, describing them as exactly what they were. The complete distinction between that case and this is that an operatic performance remains the property of the producer despite its public performance, see Capitol Records v. Mercury Records Corporation, 2 Cir., 221 F.2d 657, while the design of a garment remains the property of the designer only until such time as the garment is sold. See Judge Learned Hand's statement at page 84 in Fashion Originators Guild of America v. Federal Trade Comm., 2 Cir., 114 F.2d 80, affirmed 312 U.S. 457, 668, 61 S.Ct. 703, supra.

Plaintiff urges that sale by defendant of garments as copies of Dior models constitutes unfair competition because it is a fraud on the public since the quality of workmanship, material and service

obtainable from the authorized dealers is not furnished. Whatever might be the legal effect of leading the public to believe they were obtaining workmanship, material and service authorized by plaintiff, there is no evidence here that the public knows that Dior polices the material, workmanship and service of those whom it authorizes to state that the dresses sold are copies of Dior models. Plaintiff's argument would be valid if authorized manufacturers and retailers were permitted to and did call the garments, "Authorized copies of Dior models". Under those circumstances the public would soon learn the difference between "Copies of Dior models" and "Authorized copies of Dior models". Then a suit to enjoin the label "Authorized Copy of Dior Model" as false would be a simple one. Here, however, Dior has preferred not to adopt this course and has preferred to rely upon what is advanced as a proposition of law that no one, except someone authorized by Dior, can advertise dresses as copies of Dior models, even if that statement is true.

I am told that the indiscriminate advertising of dresses as copies of Dior models harms Dior and those who maintain the Dior standards. I have no doubt that, if someone sold dresses as copies of Dior models which were so poorly made that they were not copies, the sale would be subject to injunction at suit by Dior. It may be that such a case can be made out here at trial. Indeed that was one of the reasons that led me to refuse to grant summary judgment dismissing the complaint. Nevertheless, no such case has been made out by the affidavits before me.

■ The sale of a copy of a model designed by a certain couturier with the statement that it is a copy of a model designed by that couturier, naming him, does not constitute unfair competition with the couturier.

The question arises whether the Lanham Act, which was passed in 1946 and created certain rights against unfair competition, aids plaintiff in this case. The section creating such rights is sec-

tion 43, Act of July 5, 1946, c. 540, title VIII, 60 Stat. 441, 15 U.S.C. § 1125(a). It reads, "Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin or any false description or representation, including words or other symbols tending falsely to describe or represent the same, * * * shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

There is nothing false about a statement that a garment is a copy of a Dior model when it is such a copy so the new right against unfair competition created by the Lanham Act is not here infringed.

█ Plaintiff urges interference with contractual relations as a ground for a preliminary injunction. I have great difficulty in grasping the thought. If we assume that plaintiff has no power to prevent the sale of copies of its garments as copies of Dior models, without creating a structure of contracts with certain customers authorizing them alone to sell copies of Dior's garments as copies of Dior, the mere creation of such a structure will not generate the power. If Dior has no power to give an exclusive right to Saks Fifth Avenue to use the Dior name in connection with Dior copies, Dior cannot create that power by purporting to give the exclusive right and then saying that it has given Saks Fifth Avenue a contract right protected against the interference which Alexander's use of the Dior name in connection with sale of Dior copies constitutes. Interference with relations under an invalid contract provision will not be enjoined. One who has promised to give more than he has power to give cannot create that power by making the promise. There is here no such interference with contractual relations as to warrant the granting of a preliminary injunction.

That leaves for answer the question whether the registration of the name Dior as a trade-mark has created rights against defendant which entitle plaintiff to an injunction against the sale of copies of plaintiff's models accompanied by the true statement that they are such copies. We have seen that, unless there is something in the trade-mark law against it, defendant may with impunity adopt such a practice. Is there anything so sacrosanct about a trade-mark that registering the name Dior as a trade-mark would convert the innocent sale of a garment as a copy of the Dior model into a violation of Dior's rights? The answer is clearly no. As Mr. Justice Holmes said in Prestonettes, Inc. v. Coty, 264 U.S. 359, 44 S.Ct. 350, 351, 68 S.Ct. 731, "When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo".

The question remains whether the Lanham Act has changed the rule of the Prestonettes case. That Act created no enforceable claim in favor of the trade-mark owner in the absence of deception.

Section 32(1) of that Act July 5, 1946, c. 540, title VI, 60 Stat. 437, 15 U.S.C. § 1114(1) provides, "Any person who shall, in commerce, (a) use, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of any registered mark in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services * * * shall be liable to a civil action".

The only other section of the Lanham Act which creates a claim in favor of the trade-mark owner is section 43, above quoted. That too is limited in its effect to cases of deception.

It has been argued by some that the law ought to afford redress to a trade-mark owner when his mark has been, so to speak, tarnished by unauthorized use

by another, even though no falsity or deception was involved. To the regret of these the Lanham Act did not accomplish their end. See Federal Unfair Competition Law at the End of the First Decade of the Lanham Act: Prologue or Epilogue? by Walter J. Derenberg, 32 N.Y.U.Law Rev. 1029.

Defendant's motion for summary judgment is denied.

Plaintiff's motion for a preliminary injunction is denied.

So ordered.